— FOR PUBLICATION —

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRIAN O'DONNELL,<br>Plaintiff,<br><br>v.<br><br>TINICUM TOWNSHIP; POLICE OFFICER WILLIAM H. YOUNG; POLICE OFFICER KEVIN W GAUL,<br>Defendants. | CIVIL ACTION<br><br>NO. 14-2171 |

## OPINION

This case arises out of an incident in which Defendant, police officer Kevin W. Gaul, while attempting to arrest Plaintiff Brian O'Donnell, backed his police car into the motorcycle O'Donnell was riding, causing him injury. O'Donnell alleges that Gaul struck him intentionally. Gaul argues there is no evidence that that the contact was intentional. O'Donnell has asserted a Fourth Amendment claim against Gaul, individually, alleging Gaul used excessive force in arresting him. Gaul moves for summary judgment against that claim. He argues that the excessive force claim fails because he did not seize O'Donnell and because he is entitled to qualified immunity. For the reasons discussed below, the motion will be granted in part and denied in part.

I.     STATEMENT OF FACTS

The following facts are identified in the parties' briefs as undisputed for the purposes of summary judgment. On the date of the incident in question, O'Donnell and his companions had transported two off-road motorcycles, referred to as dirt bikes, to an area of Hog Island Road, which runs between the Delaware River and the Philadelphia International Airport. Mot. at 2 ¶ 1; Opp. at 2 ¶ 1. They rode their motorcycles along dirt and rock trails along the railroad alongside the river. Mot. at 2 ¶¶ 2-3, 7; Opp. at 3 ¶¶ 2-3, 7. O'Donnell and his companions had

been riding for about ninety minutes when they observed a police officer in his marked vehicle in a parking lot near the trail. Mot. at 2-3 ¶¶ 8-10; Opp'n at 3 ¶¶ 8-10. They started to head back the other way, and the officer did not stop them so they just kept going. Mot. at 3 ¶12; Opp'n at 3 ¶ 12. At the time they turned around, O'Donnell and his companions were fifty to one-hundred feet from the officer. Mot. at 3 ¶ 13; Opp'n at 3 ¶ 13. O'Donnell and his companions stayed in the woods for about thirty minutes and then saw another officer parked in his vehicle in a "cut through" area near the trial. He did not stop them, so they kept on going. Mot. at 3 ¶ 14; Opp'n at 3 ¶ 14. The officer did not have his flashing lights activated. Mot. at 3 ¶ 16; Opp'n at 3 ¶ 16. On a third occasion, O'Donnell and his companions came across yet another police officer, Defendant Gaul, in his vehicle in another cut through, but they weren't aware of anyone chasing them. Mot. at 3 ¶ 17; Opp'n at 3 ¶ 17. As they rode past the officer, he put his vehicle into reverse and struck O'Donnell's motorcycle. Mot. at 3 ¶ 17; Opp'n at 3 ¶ 17. O'Donnell was travelling between twenty-five and forty miles per hour at the moment of contact. Mot. at 4 ¶ 21; Opp'n at 3 ¶ 21. O'Donnell's motorcycle was thrown inside the railroad tracks, its tires were punctured, and O'Donnell lost control of the bike and crashed. Mot. at 4 ¶ 22; Opp'n at 3 ¶ 22. Gaul then arrested O'Donnell at the scene of the crash. Mot. at ¶¶ 24-28; Opp'n ¶¶ 24-28. O'Donnell suffered a fractured knee cap and had a pin placed in one of his toes that had been dislocated. He also suffered a laceration to the knee and to his foot and head as well as a swollen elbow and thumb. Mot. at 6 ¶ 36; Opp'n at 4 ¶ 36. After the incident, O'Donnell received a citation and, ultimately, pleaded guilty to the citation. Mot. at 6 ¶ 37; Opp'n at 4 ¶ 37.

## II.     LEGAL STANDARD

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Alabama v. North*

*Carolina*, 560 U.S. 330, 345 (2010) (citations and internal quotation marks omitted). "The substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing [summary judgment].'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)) (alteration in original). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

## III. ANALYSIS

Gaul argues that he is entitled to summary judgment on two grounds.[1] First, he argues that he did not seize O'Donnell for Fourth Amendment purposes because the evidence shows he did not <u>intend</u> to strike O'Donnell's motorcycle with his police car. Second, he argues that, even if there is sufficient evidence to create a question of fact as to his intent, he is entitled to qualified immunity because his conduct in bringing the chase to a stop was lawful or because he reasonably believed his conduct to be lawful when he committed it.

### A. *Whether Gaul Intentionally Seized O'Donnell*

The Fourth Amendment to the Constitution protects citizens against unreasonable seizure. U.S. Const. amend. IV. "'[W]henever an officer restrains the freedom of a person to

---

[1] Gaul also has moved for summary judgment with respect to O'Donnell's claim under the Fourteenth Amendment. Mot. at 15-17. O'Donnell did not respond to Gaul's argument regarding that claim and, at oral argument, his attorney acknowledged that he was no longer pursuing that argument. Accordingly, the claim is waived, and partial summary judgment will be granted as to that claim. *Seals v. City of Lancaster*, 553 F. Supp. 2d 427, 432 (E.D. Pa. 2008); *Hackett v. Cmty. Behavioral Health,* No. 03-6254, 2005 WL 1084621, at *6 (E.D. Pa. 2008).

3

walk away, he has seized the person." *Brower v. County of Inyo*, 489 U.S. 593, 595 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). A seizure occurs "when there is a governmental termination of freedom of movement *through means intentionally applied*." *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (emphasis in original) (quoting *Brower*, 489 U.S. at 597). For a seizure to be unconstitutional, however, the officer must have made an "intentional acquisition of physical control" of the person. *Brower*, 489 U.S. at 586. Thus, the Supreme Court has explained that if a police officer pursues a suspect and attempts to stop him through "a show of authority represented by flashing lights" and the suspect crashes his vehicle, there has been no Fourth Amendment seizure, but that if the officer "pull[s] alongside the fleeing car and sideswipes it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure." *Id.* at 597.

Gaul's deposition testimony is that he did not collide with O'Donnell's motorcycle. Gaul Dep. at 41:10-42:8. O'Donnell's testimony is that Gaul's police car struck his motorcycle, causing him to crash. O'Donnell Dep. at 29:20-32:12. Gaul acknowledges that O'Donnell's testimony differs from his but concedes that, for the purposes of summary judgment, the Court must view the facts in the light most favorable to the Plaintiff. Thus, the Court must assume for the purposes of this motion that the collision actually did occur. *See Scott*, 550 U.S. at 378. On that basis, assuming that Gaul struck O'Donnell's motorcycle causing him to lose control and crash, a seizure occurred. *See id.* at 381 (ramming fleeing automobile causing it to crash is a seizure); *Brower*, 489 U.S. at 598-99 (fleeing motorist who crashed into roadblock was seized).

Gaul argues, however, that, even if his cruiser did hit O'Donnell's motorcycle, he did not <u>unconstitutionally</u> seize O'Donnell because he did not strike O'Donnell's motorcycle <u>intentionally</u>. At oral argument O'Donnell relied on the following facts to create a genuine

4

factual dispute over whether Gaul intended to seize O'Donnell by striking O'Donnell's motorcycle with his police vehicle. First, he highlighted that, at the time of the collision, Gaul and his colleagues had already attempted to stop O'Donnell and his companions multiple times, but that the motorcyclists had escaped them each time.[2] Second, he pointed to O'Donnell's testimony that Gaul backed up just as O'Donnell rode by at approximately thirty miles per hour. O'Donnell at 29:20-30:4. And third, he points to the incident report Gaul filed in which he stated "[t]his officer did attempt again to stop the bikes with my vehicle." Opp'n Ex. 1 at 1.

The record contains evidence that supports these contentions. Taken in the light most favorable to O'Donnell, a reasonable fact-finder could infer the following. O'Donnell and his companions had escaped Gaul's fellow officer's pursuit by driving off a paved road and into an "off-road pipeline type area," where the officer's car could not follow. Reply Ex. 1 at 10:1-13. When Gaul first attempted to stop O'Donnell and his companions, he parked his marked police car near the path and walked approximately ten to fifteen feet in their direction as he saw them coming out of the woods. Gaul Dep. at 18:4-14, 20:23-21:8. When O'Donnell and his companions saw Gaul, who was in uniform, they stopped, made a quick turnaround and headed back into the wooded area. *Id*. at 22:3-23:5. Gaul began jogging and then running after them, yelling "police." Gaul Dep. at 22:12-23:5. He ran to within thirty to forty feet of the motorcyclists but was unable to catch them. *Id*. at 24:16-25:2.

Gaul returned to his vehicle, and sat there for well over one hour, waiting for O'Donnell and his friend to reappear. *Id*. at 25:11-26:9, 27:16-21. Meanwhile, other officers entered the

---

[2] The facts O'Donnell relied on in oral argument differ to some extent from those stated in his testimony and in his brief. O'Donnell testified and argued in his brief, Opp'n at ¶¶ 42, 47-48, that Gaul never activated his flashing lights or siren, and that O'Donnell never was aware that Gaul was pursuing him. Mot. Ex. 1 at 25:6-14, 26:2-3, 27:6-9; Opp'n at 5 ¶¶ 42, 47, 48. At oral argument, O'Donnell based his argument on Gaul's contrary testimony regarding Gaul's attempts to stop O'Donnell. Regardless of this discrepancy, on summary judgment, the Court must view the evidence in the light most favorable to O'Donnell as the nonmoving party. *Scott*, 550 U.S. at 378.

woods on foot in an attempt to get the motorcycle riders to exit the woods towards where Gaul was parked. *Id*. at 20:16-21. When Gaul eventually observed O'Donnell and his friend coming out of the woods in his direction, he backed his vehicle up to within three feet of the railroad tracks so that it would be visible to them. *Id*. at 30:16-31:2. Gaul exited his vehicle and stood in the motorcyclists' path. He unholstered his taser, and yelled at the motorcyclists to stop or he would tase them. *Id*. at 32:7-13, 34:21-35:14. O'Donnell and his companions did not obey that order, however, and "blew past [the officer's] location at about 30 miles an hour." *Id*. at 32:11-14. The motorcycles passed within three to five feet of Gaul. *Id*. at 35:6-14.

Gaul reentered his vehicle and drove to the next driveway entrance crossing the motorcyclists' path in the direction the motorcycles were travelling. *Id*. at 32:18-22. Along the way, Gaul had his lights and sirens activated and was driving parallel to the motorcyclists' path and, for some of the way, was within sight of them. *Id*. at 36:2-14. At the next driveway, Gaul parked his police car, but was unable to get out because his car was surrounded by eight-foot cattails and muddy ground. *Id*. at 39:5-13. Gaul saw O'Donnell and his companions come out of the woods approximately thirty feet from him. *Id*. at 40:13-19. He hoped that his flashing lights and sirens would compel the motorcyclists to stop. *Id*. at 41:10-12, 44:11-16. But, O'Donnell and his companions did not stop for the police car, passing it at approximately thirty miles per hour. *Id*. at 41:10-15. One of O'Donnell's companions passed the police car first, approximately twenty-five feet ahead of O'Donnell. O'Donnell Dep. at 29:2-6. Just as O'Donnell was passing the police car, Gaul backed his vehicle up from a standing stop and collided with O'Donnell's back right fender. *Id*. at 29:20-30:4. The collision threw O'Donnell's motorcycle onto the railroad tracks, where his tires punctured and went flat, all causing him to

6

crash. *Id*. at 30:7-32:13. The crash rendered O'Donnell unable to escape and enabled Gaul to place O'Donnell under arrest. *Id*. at 35:5-23, 36:16-21, 39:6-8.

A jury might reasonably infer from these facts that, having failed in multiple attempts to stop O'Donnell, Gaul decided to knock him off his motorcycle in order to prevent O'Donnell from getting away yet again. A jury also could read Gaul's incident report as stating that he "attempted to stop the bikes with [his] vehicle" by hitting them intentionally. Accordingly, a genuine factual question exists regarding Gaul's intent, and he is not entitled to summary judgment based on the alleged absence of an intentional seizure.[3]

### B. *Qualified Immunity*

Gaul also argues that he is entitled to summary judgment on the grounds of qualified immunity. Whether an official is entitled to qualified immunity turns on two determinations: (1) whether the evidence presented shows a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's conduct. *Pearson v. Callahan*, 555 U.S. 223, 232, 242 (2009).

### 1. **Whether the Evidence Reflects a Constitutional Violation**

---

[3] Gaul relies on *Myrick v. Collingdale Borough*, No. 11-2791, 2012 WL 4849129 (E.D. Pa. Oct. 12, 2012), for his argument that, in the absence of evidence other than a mere accusation that the officer intentionally struck the plaintiff, a court must grant summary judgment. Mot. at 13-14. Of course, the plaintiff in such a case will never be able to testify directly to the officer's intent. Instead, a court is required to evaluate the surrounding circumstances for evidence from which intent can be inferred. Thus, in *Myrick*, where the court found no genuine issue of fact as to the officer's lack of intent, the officer struck the plaintiff's vehicle from behind after the plaintiff had pulled into a driveway. 2012 WL 4849129 at *7. In addition to the officer's testimony that the collision was accidental, the court relied on evidence that a wall blocked the officer's view of the driveway, that he braked when he saw the plaintiff's vehicle, leaving skid marks visible on the pavement, and that the plaintiff could not remember if she might have been backing up at the time of the impact. *Id*. at *6-7. In other cases, courts have relied on other circumstantial evidence to establish a genuine issue of fact for trial. *See Belmon v. City of Philadelphia*, 895 F. Supp. 2d 659, 666 (E.D. Pa. 2012) (testimony that the plaintiff heard the officer's car accelerate prior to the impact); *Ferguson v. Pennsylvania*, No. 05-280, 2009 WL 723426, at *4 (W.D. Pa. Mar. 13, 2009) (evidence that officer saw plaintiff standing at the side of the road). Here, the surrounding circumstances reasonably could support an inference of intent.

O'Donnell claims that Gaul used excessive force in striking O'Donnell's motorcycle with his vehicle. Opp. at 11-13. A claim that an officer used excessive force to effect an arrest arises under the Fourth Amendment's guaranty of individuals' "right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quoting U.S. Const. amend IV). The test for determining whether force used in an arrest is excessive is one of objective reasonableness. *Sharrar v. Felsing*, 128 F.3d 810, 820 (3d Cir. 1997).[4] Measuring the reasonableness of a use of force "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 7-8). The analysis is a fact-specific one and includes consideration of such factors as: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396. The Third Circuit, in *Sharrar,* identified the following additional factors for consideration: the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." 128 F.3d at 822. "[T]he fact that the use of force was of such an extent as to lead to an injury [also] is . . . a relevant factor to be considered as part of the totality" of the circumstances. *Id*. These factors are to be analyzed with "allowance for the fact that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Sharrar*, 128 F.3d at 821 (quoting *Graham*, 490 U.S. at 396).

---

[4] On summary judgment, once the court takes the facts in the light most favorable to the plaintiff and draws all reasonable inferences in his favor, the decision whether, on the facts so determined, the officer's conduct was reasonable "is a pure question of law." *Scott*, 550 U.S. at 381 n.8.

At oral argument, Gaul contended that, even if he had intentionally struck O'Donnell's motorcycle with his vehicle, his conduct would have been reasonable given the Supreme Court's decision in *Scott*. In *Scott*, police were engaged in a high speed pursuit of a suspect who was travelling on a two-lane road at speeds exceeding eighty-five miles per hour. 550 U.S. at 374-75. At one point, the suspect had been cornered in a parking lot and had escaped by crashing into Scott's police car and returning to the road at high speed. *Id*. at 375. The chase had proceeded for nearly ten miles, during which the suspect swerved around more than a dozen other cars, frequently crossed the yellow line and ran multiple red lights. *Id*. The police attempted to execute a "Precision Intervention Technique" in order to cause the suspect's vehicle to spin to a stop. *Id*. Instead, the suspect lost control of his vehicle, which ran down an embankment and overturned, leaving the suspect a quadriplegic. *Id*. In upholding the officer's conduct as reasonable, the Court pointed to the fact that the suspect "posed an actual an imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and the officers involved in the chase." *Id*. at 384. The Court also took into account the relative culpability of the suspect in recklessly creating such a danger measured against the risk to innocent bystanders. *Id*.

The facts of this case are far removed from those of *Scott*, and the considerations on which the *Scott* Court based its decision are absent here. Applying the *Graham*/*Sharrar* factors to the facts presented on summary judgment here, the Court concludes that the force used was excessive. The crime O'Donnell was arrested for was not severe.[5] O'Donnell was not riding his motorcycle on a public roadway, but on a dirt trail. He did not pose a danger to Gaul, who was

---

[5] Gaul testified that he and his colleagues were attempting to stop O'Donnell for trespassing. Gaul Dep. at 9:9-11; 11:10-17. In his brief, Gaul states that O'Donnell pled guilty to disorderly conduct, Mot. at 14, and O'Donnell acknowledged as much at oral argument. Disorderly conduct, however, is either a summary offense or, at most, a third-degree misdemeanor. 18 Pa. Cons. Stat. § 5503.

9

sitting in his police car off the trail, or to the public in general. There was no basis for Gaul to believe that O'Donnell was violent or dangerous or that he was armed. Although Gaul may have believed O'Donnell was fleeing to avoid arrest, he was not actively resisting arrest. O'Donnell's companions had fled, so that Gaul was not faced with confronting multiple suspects. And, the incident ended in significant injury to O'Donnell. In sum, none of the relevant factors militated in favor of Gaul using the level of force that he did to effect O'Donnell's arrest, and that force was unreasonable under the circumstances.

### 2. Whether Gaul Violated a Clearly-Established Right

"An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statute or constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. —, —, 131 S. Ct. 2074, 2080 (2011)).

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Brosseau v. Haugen*, 543 U.S. 596, 599 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)) (citation and internal quotation marks omitted). A court should not "'define clearly established law at a high level of generality' . . . since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 134 S. Ct. at 2023 (quoting *al-Kidd*, 131 S. Ct. at 2074).

In the present case, the right to be free from excessive force during an arrest is well established. *See Graham*, 490 U.S. at 394-95. Indeed, the Third Circuit requires analysis of the *Graham* and *Sharrar* factors to determine the reasonableness of a use of force in an arrest and has concluded that the factors also are well established and that a "reasonable officer would be

guided by" them. *Estate of Smith v. Marasco*, 430 F.3d 140, 150 (3d Cir. 2005); *accord Green v. N.J. State Police*, 246 F. App'x 158, 162-63 (3d Cir. 2007); *Couden v. Duffy*, 446 F.3d 483, 497 (3d Cir. 2006). An officer who applies those factors unreasonably is not entitled to qualified immunity. *Estate of Smith*, 430 F.3d at 150.

To be sure, there are situations in which application of the *Graham* and *Sharrar* factors is unclear, so that an officer's misapplication of the factors to the circumstances cannot be said to be unreasonable. On the facts presented on summary judgment here, however, this is not one of them. As noted in subsection IV.B.1, *supra*, all of the factors applicable here militated strongly against the level of force used by Gaul against O'Donnell. If Gaul intentionally backed his car into a motorcycle that was travelling at thirty miles per hour in the circumstances presented here, then he applied the *Graham*/*Sharrar* factors unreasonably. He could not reasonably have believed his conduct was permissible under the existing precedent. Accordingly, Gaul is not entitled to qualified immunity, *see Estate of Smith*, 430 F.3d at 150, and his motion for summary

judgment on that ground will be denied.

An appropriate Order follows.

Date: **June 11, 2015**

**BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

_____

**WENDY BEETLESTONE, J.**